ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                :

        - v. -                          :        SEALED INDICTMENT

RICHARD AMMAR CHICHAKLI,                :        S2 09 Cr. 1002
        a/k/a "Robert Cunning,"
        a/k/a "Raman Cedorov,"          :

                Defendant.              :

- - - - - - - - - - - - - - - - - - - x

## COUNT ONE

### CONSPIRACY TO VIOLATE THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT

        The Grand Jury charges:

                    BACKGROUND

                    *The Defendant*

        1.    Since at least in or about 1996, RICHARD AMMAR

CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the

defendant, a United States citizen, has been closely associated

with a co-conspirator not named herein ("CC-1"), and has played a

significant role in connection with numerous companies controlled

by CC-1.  Since at least in or about 1996, CC-1 has operated a

network of air cargo companies based in countries in the Middle

East, Africa, Eastern Europe and the United States.  Shortly

after the breakup of the Soviet Union, CC-1 was able to acquire

surplus or obsolete airplanes which he used to deliver arms and

ammunition.  In large part because of his/her extensive network

of aircraft and operations companies, between 1996 and 2008, CC-1

had the capacity to transport large-scale military machinery, as well as extensive stores of weapons to virtually any location in the world.  According to the United Nations and the Department of the Treasury, for example, the arms CC-1 has sold or brokered have helped fuel conflicts and support regimes in Afghanistan, Angola, the Democratic Republic of the Congo, Liberia, Rwanda, Sierra Leone and Sudan.

2.   One of the principal, and earliest, companies in the network owned and operated by CC-1 was Air Cess, which was registered in Liberia with CC-1 as its chief officer.  Other businesses in CC-1's network include Centrafrican Airlines, San Air General Trading, Air Bas, Air Pass, Abidjan Freight, Air Zory, Bukavu Aviation Transport, Business Air Services, Gambia New Millennium Air Company, CET Aviation, Irbis Air Company, Moldtransavia SRL, Odessa Air, Transavia Network, and Santa Cruz Imperial.  As reported by the United Nations, of these companies, San Air General Trading and Centrafrican Airlines played a key role in supplying arms to the regime of former President Charles Taylor of Liberia and the Sierra Leone rebel group, the Revolutionary United Front ("RUF").  A United Nations committee and the Department of the Treasury determined that in exchange for these supplies, CC-1 received payment from Liberia's international ship registry as well as diamonds and other

valuable commodities acquired illegally by Taylor's associates and the RUF.

3.   RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, has assisted in the operations and financial management of CC-1's network of companies.  As of 2005, CHICHAKLI's resume described his extensive management and coordination of activities for Air Cess, Air Bas, and Centrafrican Airlines, as well as the fact that he served as the Chief Financial Officer for several companies.

### *United Nations Sanctions Against the Defendant*

4.   Since at least 2000, CC-1 has been identified by the United Nations as being responsible for arming a number of international conflicts, and playing a critical role particularly in those areas where the weapons trade has been embargoed by the United Nations.  According to United Nations reporting, CC-1 operated through a web of different companies, some of which were run by his former employees and associates, obscuring his involvement in their operations, and also registered his aircraft in countries that allowed him to circumvent international regulations on air cargo -- flying his planes under so-called "flags of convenience."  For example, a United Nations report on the conflicts in Angola over diamond-mining territory, published in December of 2000, included this observation: "Landing heavy cargo planes with illicit cargoes in war conditions and breaking

3

international embargoes such as the one on Angola requires more than individual effort. It takes an internationally organized network of individuals, well funded, well connected and well versed in brokering and logistics, with the ability to move illicit cargo around the world without raising the suspicions of the law or with the ability to deal with obstacles. One organization, headed, or at least to all appearances outwardly controlled by an Eastern European, [CC-1], is such an organization." This United Nations report also addressed the close relationship between CC-1 and RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, noting, "[o]ver the last decade, Mr. Chichakli has held senior positions in companies owned by [CC-1]. ... As chief financial manager, his responsibilities include directing the accounting, financial and reporting activities, including public reporting, auditing and overall responsibility for the financial systems."

5. Beginning in 2001, the United Nations Security Council adopted a series of resolutions, aimed at addressing the growing conflict in Liberia. Starting with resolution 1343, which was unanimously adopted on March 7, 2001, the Security Council required all members states to take necessary measures "to prevent the sale or supply to Liberia, by their nationals or from their territories or using their flag vessels or aircraft, of arms and related materiel of all types, including weapons and

4

ammunition, military vehicles and equipment, paramilitary equipment and spare parts ... whether or not originating in their territories."  Between 2001 and 2004, the Security Council adopted 11 additional resolutions, which in relevant part expressed concern about the growing conflict in Liberia and the support for rebel groups in Liberia and neighboring countries, and further recognized the role in fueling these conflicts that was played by the illicit diamond and arms trades.  During the same time period, the United Nations Security Council also adopted similar resolutions aimed at addressing similar conflicts in other African states, including Angola, Sierra Leone, the Sudan, and the Democratic Republic of the Congo.  Recognizing the role played by CC-1 and his network of companies in fueling the conflict in Liberia, as well as other conflicts in West Africa, these resolutions in part attempted to limit the ability of CC-1 and individuals closely associated with him/her to conduct business and to travel.

6.    On December 22, 2003, the United Nations Security Council unanimously adopted resolution 1521, which recognized "the linkage between the illegal exploitation of natural resources such as diamonds and timber, illicit trade in such resources, and the proliferation and trafficking of illegal arms as a major source of fuelling and exacerbating conflicts in West Africa, particularly in Liberia," and which authorized the

formation of a committee, consisting of all the members of the Security Council, to undertake certain tasks. Among these tasks was the designation of individuals who would be subject to resolution 1521's travel ban. As part of resolution 1521, the Security Council decided that all member states "shall take the necessary measures to prevent the entry into or transit through their territories of all such individuals, as designated by the Committee, who constitute a threat to the peace process in Liberia, or who are engaged in activities aimed at undermining peace and stability in the subregion, including those senior members of former President Charles Taylor's Government and their spouses and members of Liberia's former armed forces who retain links to former President Charles Taylor, ... and any other individuals, or individuals associated with entities, providing financial or military support to armed rebel groups in Liberia or in countries in the region." In 2003, the member nations of the Security Council were Angola, Bulgaria, Cameroon, Chile, China, France, Germany, Guinea, Mexico, Pakistan, the Russian Federation, Spain, the Syrian Arab Republic, the United Kingdom and the United States.

7. On March 12, 2004, the United Nations Security Council unanimously adopted resolution 1532, which in part directed member states to freeze all funds, financial resources and other economic assets of former Liberian President Charles

6

Taylor, his immediate family members and other close allies or associates as designated by a United Nations Security Council Committee that had previously been established for this purpose. In 2004, the member nations of the Security Council were Algeria, Angola, Benin, Brazil, Chile, China, France, Germany, Pakistan, Philippines, Romania, the Russian Federation, Spain, the United Kingdom and the United States.

8.    On March 16, 2004, the United Nations Security Council Committee, pursuant to United Nations resolution 1521, approved a list of individuals subject to the travel restrictions imposed by that resolution.  Both CC-1 and RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, were among those individuals included on the travel ban list promulgated by the United Nations Security Council at that time.  The Security Council Committee explained the reason for CC-1's designation as follows: "Businessman, dealer and transporter of weapons and minerals.  Arms dealer in contravention of UNSC resolution 1343.  Supported former President Taylor's regime in effort to destabilize Sierra Leone and gain illicit access to diamonds."  The United Nations Security Council Committee described the rationale for CHICHAKLI's designation as follows: "[Chichakli] has been an employee/associate of [CC-1] for about a decade.  The UN identified Chichakli as [CC-1's] Chief Financial Manager and,

therefore, as one who acts at [CC-1's] direction.  His own resume details his senior positions with several [CC-1]-controlled companies.  A certified public accountant and certified fraud examiner with more than 12 years of experience, [Chichakli] plays a significant role in assisting [CC-1] in setting up and managing a number of his key firms and moving money (both for acquisition of assets and reparation of profits)....  Chichakli is an officer of San Air General Trading.  Payments for many of the weapons that went to Liberia through [CC-1's] network in 2000 and 2001 were directed to San Air's bank accounts.  As such, Chichakli is associated with an entity providing financial or military support to armed rebel groups in Liberia or in countries in the region."

9.    Shortly thereafter, on June 14, 2004, the United Nations Security Council Committee also placed CC-1 and RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, on the asset freeze list that had been established as part of resolution 1532.  As a result of their placement on the asset freeze list, all United Nations member states were directed to freeze any funds, financial assets and economic resources owned or controlled directly or indirectly by CC-1 and CHICHAKLI, and to ensure that such monies would not be made available to them, or used for their benefit, within the member states' territories.  Several companies owned, managed or affiliated with CC-1 and CHICHAKLI were also placed on the asset

freeze list, including Air Cess, Air Zory, Airbas, ATC Ltd.,
Bukavu Aviation Transport, Business Air Services, Centrafrican
Airlines, Central Africa Development Fund, CET Aviation
Enterprise, Chichakli & Associates, PLLC, Continue Professional
Education, Inc., Daytona Pools, Inc., DHH Enterprises, Inc.,
Gambia New Millennium Air Company, IB of America Holdings, Inc.,
Irbis Air Company, Moldtransavia SRL, Odessa Air, Orient Star
Corporation, Richard A. Chichakli, P.C., San Air General Trading
FZE, Santa Cruz Imperial Airlines, Southbound, Ltd., Trans
Aviation Global Group, Inc., Transavia Network, Vial Company and
Westbound, Ltd.

### United States Sanctions Against the Defendant

10.   The International Emergency Economic Powers Act,
Sections 1701 to 1706 of Title 50 of the United States Code
("IEEPA"), grants to the President of the United States a broad
spectrum of powers necessary to "deal with any unusual and
extraordinary threat, which has its source in whole or
substantial part outside the United States, to the national
security, foreign policy, or economy of the United States, if the
President declares a national emergency with respect to such
threat."  Title 50, United States Code, Section 1701(a).

11.   Pursuant to IEEPA, the President of the United
States is authorized, among other things, to "investigate,
regulate, or prohibit -- (i) any transactions in foreign

exchange, (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of a foreign country or any national thereof, [and] (iii) the importing and exporting of currency or securities." 50 U.S.C. § 1702(a)(1)(A). The President exercises these IEEPA powers through Executive Orders that impose economic sanctions to address particular emergencies, and delegate IEEPA powers for the administration of those sanctions programs.

12. In addition to articulating a particular threat, by Executive Order the President may also designate specific individuals and entities who constitute and/or contribute to the threat, and set forth standards for identifying more such individuals and entities. The President delegates the task of determining who meets these standards to an agency in the Executive Branch, usually the Department of the Treasury. Those "designated" individuals who are determined to fit the standards are subject to the Executive Order's economic sanctions.

13. The Department of the Treasury's Office of Foreign Assets Control ("OFAC") is the office principally responsible for administering United States economic sanctions programs. These programs are primarily directed against foreign states and nationals, including sponsors of global terrorism and foreign narcotics traffickers, to implement United States foreign policy

and national security goals.  Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential wartime and peacetime national emergency powers. OFAC also acts under authority granted by specific legislation to impose controls on transactions and to freeze, or "block," certain foreign property and interests in property within the United States or in the possession or control of United States persons.  The property and property interests blocked by OFAC pursuant to an Executive Order may not be transferred, withdrawn, exported, paid, or otherwise dealt in by United States persons or in the United States without OFAC's prior authorization.

14.  On July 22, 2004, the President of the United States, pursuant to the authority granted by, among other things, IEEPA, signed Executive Order 13348, entitled "Blocking Property of Certain Persons and Prohibiting the Importation of Certain Goods From Liberia."  Consistent with the steps taken by the United Nations, Executive Order 13348 found, among other things, that "the actions and policies of former Liberian President Charles Taylor and other persons, in particular their unlawful depletion of Liberian resources and their removal from Liberia and secreting of Liberian funds and property, have undermined Liberia's transition to democracy and the orderly development of its political, administrative, and economic institutions and resources."  The Executive Order further found that "the

Comprehensive Peace Agreement signed on August 18, 2003, and the related ceasefire have not yet been universally implemented throughout Liberia, and that the illicit trade in round logs and timber products is linked to the proliferation of and trafficking in illegal arms, which perpetuate the Liberian conflict and fuel and exacerbate other conflicts throughout West Africa." The President determined that these circumstances in Liberia "constitute[d] an unusual and extraordinary threat to the foreign policy of the United States" and accordingly declared a "national emergency to deal with that threat." The national emergency and the sanctions set forth in the Order became effective on July 23, 2004, and they remain in effect today.

15. Among other things, Executive Order 13348 prohibited any transaction or dealing by a United States person or within the United States in "all property and interests in property of [certain listed or designated persons]," and any transaction by a United States person or within the United States "that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this order." The Order prohibited transactions, by United States persons or within the United States, in the property and interests in property of those foreign individuals and entities listed in the Annex to the Order, as well as those persons and entities later determined and designated by the Secretary of the

12

Treasury, in consultation with the Secretary of State: "(A) to be or have been an immediate family member of Charles Taylor; (B) to have been a senior official of the former Liberian regime headed by Charles Taylor or otherwise to have been a close ally or associate of Charles Taylor or the former Liberian regime; (C) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the unlawful depletion of Liberian resources, the removal of Liberian resources from that country, and the secreting of Liberian funds and property by any person whose property and interests in property are blocked pursuant to this order; or (D) to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order."

16. Pursuant to IEEPA and Executive Order 13348, those individuals and entities found to have the affiliations described above were to be listed on the Specially Designated Nationals and Blocked Persons List (the "SDN List"), a listing maintained by the Treasury Department which contains the names of those individuals and entities whose financial transactions are to be blocked because of specified Executive Orders signed pursuant to IEEPA.

17.   Among the 28 individuals identified by the President in the Annex to Executive Order 13348 as subject to the Order's prohibitions was CC-1.

18.   On April 26, 2005, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, was designated by the Department of the Treasury, through OFAC, as a person to whom the prohibitions and sanctions of Executive Order 13348 applied, primarily because of CHICHAKLI's close affiliation with CC-1 and CC-1's network of companies.  Also at that time, OFAC designated several aviation and other companies affiliated with CC-1, including Air Cess, Centrafrican Airlines, San Air General Trading, Air Bas, CET Aviation, Irbis, Transavia Travel and Santa Cruz Imperial.  In a press release issued in connection with these new designations, the Department of the Treasury identified CC-1 as "an international arms dealer and war profiteer," who "runs a network of air cargo companies" and "controls what is reputed to be the largest private fleet of Soviet-era cargo aircraft in the world."  According to the Department of the Treasury "[t]he arms [CC-1] has sold or brokered has [sic] helped fuel conflicts and support UN sanctioned regimes in Afghanistan, Angola, the Democratic Republic of the Congo, Liberia, Rwanda, Sierra Leone and Sudan."

19.   Pursuant to IEEPA and Executive Orders 13348, the Department of the Treasury, through OFAC, promulgated regulations

titled "Former Liberian Regime of Charles Taylor Sanctions Regulations." Title 31, Code of Federal Regulations, Part 593. Among other things, the regulations provide that:

       a.   With certain exceptions, "property and interests in property [of Specially Designated Nationals and Blocked Persons] that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, [ ] are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in." Title 31, Code of Federal Regulations, Section 593.201(a).

       b.   "[A]ny transaction by any U.S. person or within the United States . . . that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this part is prohibited." Title 31, Code of Federal Regulations, Section 593.206(a). "[A]ny conspiracy formed to violate the prohibitions set forth in this part is prohibited." Title 31, Code of Federal Regulations, Section 593.206(b).

       20.   Pursuant to Section 206 of IEEPA, Title 50, United States Code, Section 1705, a willful violation of "any license, order, or regulation" issued under IEEPA is a crime.

<u>THE CONSPIRACY TO EVADE OFAC SANCTIONS AND VIOLATE IEEPA</u>

21.   From at least in or about June 2007, up to and including in or about December 2007, in the Southern District of New York and elsewhere, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Sections 1701 to 1706 of Title 50, United States Code.

22.   It was an object of the conspiracy that RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and others known and unknown, unlawfully, willfully, and knowingly did conduct financial transactions for the purpose of, and which had the effect of, violating, and which facilitated the violation of, the prohibitions set forth in Executive Order 13348 and the regulations issued under the Order and under the International Emergency Economic Powers Act, including the "Former Liberian Regime of Charles Taylor Sanctions Regulations," Title 31, Code of Federal Regulations, Part 593, in violation of Sections 1701 to 1706 of Title 50, United States Code.

<u>MEANS AND METHODS OF THE CONSPIRACY</u>

23.   The United Nations and OFAC sanctions described above, imposed beginning in early 2004, exposed much of the

16

network of companies owned and operated by CC-1, and made it difficult for both CC-1 and RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, to do business within their existing corporate structure. Accordingly, CC-1 and CHICHAKLI took steps to form new aviation and other companies, and took specific steps to register these companies in the names of other individuals, and otherwise to create the false appearance that CC-1 and CHICHAKLI had no affiliation with these new companies.

24.   In or about 2004, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and CC-1 created and registered Samar Airlines, which purported to be a commercial airline and a passenger and cargo aircraft charter service, based in the Republic of Tajikistan. At all relevant times, Samar Airlines was owned, controlled and operated by CC-1 and CHICHAKLI; however, their names deliberately were not used in certain public documents and filings related to the company. Instead, although CC-1 and CHICHAKLI were personally involved in the operational and business affairs and decisions of Samar Air, other individuals were expressly held out to the public as being the officers of the company.

25.   Starting at least in or about the summer of 2007, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and CC-1 took steps to purchase

airplanes on behalf of Samar Airlines.  Specifically, starting in or about July of 2007, Samar Airlines contracted with an aviation company located in Florida (the "Aviation Company") for technical assistance in connection with the purchase of at least two aircraft – a Boeing 727-200 and a Boeing 737-200.  Samar Airlines also contracted with a second company located in Florida (the "Aircraft Services Company"), for the ferrying of the purchased aircraft, and the provision of crews for that purpose, from the United States to Tajikistan.

26.  In connection with the purchase of these aircraft and services relating thereto, in excess of $1.7 million was electronically transferred into bank accounts located in the United States, on behalf of Samar Airlines, from overseas bank accounts in the names of other companies.  These payments were made on behalf of Samar Airlines from the bank accounts of front companies which were also owned and controlled by CC-1.  These front companies were established, and these payments were made through their accounts, in order to protect CC-1's assets and to evade the OFAC sanctions applicable to CC-1, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and several companies identified as being owned or controlled by them.

27.  Following the wire transfers described above, OFAC became aware of RICHARD AMMAR CHICHAKLI's, a/k/a "Robert

Cunning," a/k/a "Raman Cedorov," the defendant, affiliation with Samar Air and its purchase of aircraft, technical assistance, and aircraft ferrying services from the Aviation Company and the Aircraft Services Company.  Accordingly, in or about September of 2007, OFAC blocked the funds that had been transferred, on behalf of Samar Airlines, into the United States bank accounts of the Aviation Company and the Aircraft Services Company.

      28.  From in or about September 2007 through at least in or about December 2007, in correspondence with United States regulators and authorities, specifically OFAC and the United States Ambassador to Tajikistan, CC-1 and RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, through Samar Air and its public representatives, made numerous misrepresentations about the ownership of Samar Air, and the involvement or lack thereof of CHICHAKLI in the operations and business affairs of Samar Air, in an effort to persuade OFAC to unblock the blocked funds.

<u>OVERT ACTS</u>

      29.  In furtherance of the conspiracy and to effect the illegal object thereof, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and others known and unknown, committed the following overt acts in the Southern District of New York and elsewhere:

      a.   On or about July 12, 2007, CHICHAKLI and CC-

1, on behalf of Samar Airlines, transferred approximately $339,977.35 from a bank account located in Cyprus and affiliated with the company Wartrex Holdings Limited, which funds were owned and controlled by CC-1, through a bank located in New York, New York, into the account of the Aviation Company, in connection with the purchase of an aircraft from the Aviation Company.

       b.   On or about July 12, 2007, CHICHAKLI and CC-1, on behalf of Samar Airlines, transferred approximately $52,800.00 from a bank account located in the Republic of Kazakhstan and affiliated with the company Aviakompaniya Mega, which funds were owned and controlled by CC-1, through a bank located in Salt Lake City, Utah, into the account of the Aviation Company, in connection with the purchase of an aircraft from the Aviation Company.

       c.   On or about July 13, 2007, CHICHAKLI and CC-1, on behalf of Samar Airlines, transferred approximately $54,785.00 from a bank account located in the Republic of Kazakhstan and affiliated with the company Aviakompaniya Mega, which funds were owned and controlled by CC-1, through a bank located in Salt Lake City, Utah, into the account of the Aviation Company, in connection with the purchase of an aircraft from the Aviation Company.

       d.   On or about July 23, 2007, CHICHAKLI and CC-1, on behalf of Samar Airlines, transferred approximately

$52,544.00 from a bank account located in the Republic of Kazakhstan and affiliated with the company Aviakompaniya Mega, which funds were owned and controlled by CC-1, through a bank located in New York, New York, into the account of the Aviation Company, in connection with the purchase of an aircraft from the Aviation Company.

e.   On or about July 30, 2007, CHICHAKLI and CC-1, on behalf of Samar Airlines, transferred approximately $252,000.00 from a bank account located in Russia and affiliated with the company Ilex Ventures Ltd., a company owned and controlled by CC-1, through a bank located in New York, New York, into the account of the Aviation Company, in connection with the purchase of an aircraft from the Aviation Company.

f.   On or about August 1, 2007, CHICHAKLI and CC-1, on behalf of Samar Airlines, transferred approximately $244,200.00 from a bank account located in Russia and affiliated with the company Ilex Ventures, Ltd., a company owned and controlled by CC-1, through a bank located in New York, New York, into the account of the Aviation Company, in connection with the purchase of an aircraft from the Aviation Company.

g.   On or about August 13, 2007, CHICHAKLI and CC-1, on behalf of Samar Airlines, transferred approximately $204,000.00 from a bank account located in Russia and affiliated with the company Ilex Ventures, Ltd., a company owned and

controlled by CC-1, through a bank located in New York, New York, into the account of the Aviation Company, in connection with the purchase of an aircraft from the Aviation Company.

h.   On or about August 23, 2007, CHICHAKLI and CC-1, on behalf of Samar Airlines, transferred approximately $99,030.00 from a bank account located in the Republic of Kazakhstan and affiliated with the company Aviakompaniya Mega, which funds were owned and controlled by CC-1, through a bank located in Salt Lake City, Utah, into the account of the Aviation Company, in connection with the purchase of an aircraft from the Aviation Company.

i.   On or about September 5, 2007, CHICHAKLI and CC-1, on behalf of Samar Airlines, transferred approximately $297,500.00 from a bank account located in Cyprus and affiliated with the company Trinipac Enterprises Limited, which funds were owned and controlled by CC-1, through a bank located in New York, New York, into the account of the Aviation Company, in connection with the purchase of an aircraft from the Aviation Company.

j.   On or about September 14, 2007, a letter sent to the United States Ambassador to Tajikistan, purporting to come from the public Director of Samar Airlines, falsely stated, in relevant part, that CHICHAKLI "is not an owner, shareholder, or an employee of the company, nor does he have any interest in our

company. ... His relation to the company is no more than consultant/broker to facilitate the purchase of aircraft."

k.   On or about December 10, 2007, a letter sent to OFAC, purporting to come from the public Director of Samar Airlines, falsely stated, in sum and substance, that CHICHAKLI's only role with respect to Samar Airlines was to introduce that company to another company for purposes of acquiring aircraft.

(Title 50, United States Code, Section 1705;
Title 18, United States Code, Section 371.)

## COUNT TWO

### THE MONEY LAUNDERING CONSPIRACY

30.   The allegations set forth in Count One are incorporated by reference herein as if set forth here in full.

31.   From at least in or about June 2007, up to and including in or about December 2007, in the Southern District of New York and elsewhere, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to violate Section 1956 of Title 18, United States Code.

32.   It was a part and an object of the conspiracy that RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did transport, transmit and transfer, and attempt to transport, transmit and

23

transfer monetary instruments and funds to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, CHICHAKLI caused funds from banks outside the United States to be electronically transferred into bank accounts in the United States, for the purpose of, and which transfers had the effect of, evading and avoiding, and facilitating the evasion and avoidance of, the prohibitions set forth in Executive Order 13348 and the regulations issued under the Order and under IEEPA, including the "Former Liberian Regime of Charles Taylor Sanctions Regulations," Title 31, Code of Federal Regulations, Part 593, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

<u>OVERT ACTS</u>

33.   In furtherance of the conspiracy and to effect the illegal object thereof, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and others known and unknown, committed the overt acts described in paragraph 29 above, and incorporated by reference herein as if set forth here in full.

(Title 18, United States Code, Section 1956(h).)

## COUNT THREE

### THE WIRE FRAUD CONSPIRACY

34.  The allegations set forth in Counts One and Two are incorporated by reference herein as if set forth here in full.

35.  From at least in or about June 2007, up to and including in or about December 2007, in the Southern District of New York and elsewhere, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to violate Section 1343 of Title 18, United States Code.

36.  It was a part and an object of the conspiracy that RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, to wit, a scheme in which CHICHAKLI entered into a transaction with a United States aviation company (the "Aviation Company"), in an attempt to procure airplanes from the Aviation Company, in contravention of the IEEPA and OFAC sanctions imposed against him, by concealing the true nature of his involvement in the transaction from both the Aviation Company and United States

regulators, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, CHICHAKLI caused more than $1.7 million to be transferred through a series of front companies, from outside the United States into the United States, through banks located in the Southern District of New York and elsewhere, in violation of Title 18, United States Code, Section 1343.

<u>OVERT ACTS</u>

37.  In furtherance of the conspiracy and to effect the illegal object thereof, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, and others known and unknown, committed the overt acts described in paragraph 29 above, and incorporated by reference herein as if set forth here in full.

(Title 18, United States Code, Section 1349.)

**<u>COUNTS FOUR THROUGH NINE</u>**

<u>WIRE FRAUD</u>

38.  From at least in or about June 2007, up to and including in or about December 2007, in the Southern District of New York and elsewhere, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a

scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, to wit, a scheme in which CHICHAKLI entered into a transaction with a United States aviation company (the "Aviation Company"), in an attempt to procure airplanes from the Aviation Company, in contravention of the IEEPA and OFAC sanctions imposed against him, by concealing the true nature of his involvement in the transaction from both the Aviation Company and United States regulators, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, on the dates set forth below, CHICHAKLI, acting through a series of front companies, made and caused to be made the electronic funds transfers described in the table below, which transfers were cleared through banks located in New York, New York, to bank accounts in the name of the Aviation Company:

| Count | Wire | Amount | Date |
|-------|------|--------|------|
| 4 | Wire transfer 071207285600 | $339,977.35 | 7/12/07 |
| 5 | Wire transfer 070723014575 | $52,544.00 | 7/23/07 |
| 6 | Wire transfer 0730366149009237 | $252,000.00 | 7/30/07 |
| 7 | Wire transfer 0708018078300 | $244,200.00 | 8/1/07 |
| 8 | Wire transfer 0813332954008876 | $204,000.00 | 8/13/07 |
| 9 | Wire transfer 9227100248FS | $297,500.00 | 9/5/07 |

(Title 18, United States Code, Sections 1343 and 2.)

## FIRST FORFEITURE ALLEGATION

39.   As the result of committing the IEEPA offense in violation of Title 50, United States Code, Sections 1701 to 1706, alleged in Count One of this Indictment, and the wire fraud offenses in violation of Title 18, United States Code, Sections 1343 and 1349, alleged in counts Three through Nine of this Indictment, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to the following:

a.   At least $1,732,756.00 in United States currency, in that such sum in aggregate is property representing the amount of proceeds obtained as a result of the offense.

b.   All funds and other property on deposit in account number 2000033075123, held in the name of RP Aviation Inc. at Wachovia Bank, that constitute or are derived from proceeds traceable to the offense alleged in Count One, and all property traceable thereto.

c.   All funds and other property on deposit in account number 0717213717, held in the name of Insured Aircraft Title Services at the International Bank of Commerce, that

constitute or are derived from proceeds traceable to the offense alleged in Count One, and all property traceable thereto.

        d.    All funds and other property on deposit in account number 00419223, held in the name of Aviation Refinancing Transaction LLC at Deutsche Bank, that constitute or are derived from proceeds traceable to the offense alleged in Count One, and all property traceable thereto.

        e.    All funds and other property on deposit in account number 0004503334, held in the name of Aventura Aviation LLC at Israel Discount Bank of New York, that constitute or are derived from proceeds traceable to the offense alleged in Count One, and all property traceable thereto.

        f.    All funds and other property on deposit in account number 0004503326, held in the name of Aventura Aviation LLC at Israel Discount Bank of New York, that constitute or are derived from proceeds traceable to the offense alleged in Count One, and all property traceable thereto.

<u>Substitute Assets Provision</u>

      40.  If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

        a.    cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

## SECOND FORFEITURE ALLEGATION

41.   As the result of committing the money laundering offense in violation of Title 18, United States Code, Section 1956, alleged in Count Two of this Indictment, RICHARD AMMAR CHICHAKLI, a/k/a "Robert Cunning," a/k/a "Raman Cedorov," the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 982, all property, real and personal, involved in the money laundering offense and all property traceable to such property, including but not limited to the following:

a.    At least $1,732,756.00 in United States currency, in that such sum in aggregate is property which was involved in the money laundering offense or is traceable to such property.

b.    All funds and other property on deposit in account number 2000033075123, held in the name of RP Aviation Inc. at Wachovia Bank, involved in the offense alleged in Count Two, and all property traceable to such property.

c.    All funds and other property on deposit in account number 0717213717, held in the name of Insured Aircraft Title Services at the International Bank of Commerce, involved in the offense alleged in Count Two, and all property traceable to such property.

d.    All funds and other property on deposit in account number 00419223, held in the name of Aviation Refinancing Transaction LLC at Deutsche Bank, involved in the offense alleged in Count Two, and all property traceable to such property.

e.    All funds and other property on deposit in account number 0004503334, held in the name of Aventura Aviation LLC at Israel Discount Bank of New York, involved in the offense alleged in Count Two, and all property traceable to such property.

f.    All funds and other property on deposit in account number 0004503326, held in the name of Aventura Aviation

31

LLC at Israel Discount Bank of New York, involved in the offense alleged in Count Two, and all property traceable to such property.

<u>Substitute Assets Provision</u>

42.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any

other property of the defendant up to the value of the

forfeitable property.

(Title 18, United States Code, Section 982.)


_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

RICHARD AMMAR CHICHAKLI,
a/k/a "Robert Cunning,"
a/k/a "Raman Cedorov,"

Defendant.

### INDICTMENT

S2 09 Cr. 1002

(Title 18, United States Code,
Sections 371, 1343, 1349, 1956(h) and 2;
Title 50, United States Code, Section
1705.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.