UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

UNITED STATES OF AMERICA

        - v. -

RICHARD AMMAR CHICHAKLI,

               Defendant.

:
:
:
:
:
:
:
:
:
:

S3 09 Cr. 1002 (WHP)

-------------------------------------------------------------------------------X


## THE GOVERNMENT'S SENTENCING SUBMISSION


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Christian R. Everdell
Ian McGinley
Assistant United States Attorneys
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------X
                                                                  :

UNITED STATES OF AMERICA                     :

                             :                    S3 09 Cr. 1002 (WHP)

          - v. -                        :

                             :

RICHARD AMMAR CHICHAKLI,          :

                             :

               Defendant.           :

                             :

------------------------------------------------------------------------------X


## THE GOVERNMENT'S SENTENCING SUBMISSION

      The Government respectfully submits this memorandum in connection with the defendant's sentencing, scheduled for December 4, 2014.  As discussed below, the correct advisory sentencing range under the United States Sentencing Guidelines (the "Sentencing Guidelines" or "U.S.S.G") is 87 to 108 months' imprisonment.

      The defendant participated in an elaborate and sophisticated conspiracy with co-defendant Viktor Bout and others to illegally purchase commercial airplanes, knowing full well that those purchases violated U.S. sanctions.  In connection with this fraudulent scheme, the defendant participated in a series of wire transfer payments, totaling more than $1.7 million, which were sent from overseas bank accounts into accounts in the United States.  For the reasons described more fully below, including the defendant's flagrant and repeated disregard for the law and the strong need for specific and general deterrence, a prison term within this guidelines range of 87 to 108 months is warranted under the factors set forth in Title 18, United States Code, Section, 3553(a).

## BACKGROUND

Trial in this case began on November 19, 2013.  On December 13, 2013, a jury found the defendant guilty of all nine counts charged in the Indictment: (1) one count of conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, 18 U.S.C. § 371; (2) one count of conspiracy to engage in money laundering, 18 U.S.C. § 1956(h); (3) one count of conspiracy to commit wire fraud, 18 U.S.C. § 1349; and (4) six counts of wire fraud, 18 U.S.C. § 1343.

### A.       The Offense Conduct

The evidence at trial showed that the defendant conspired with Viktor Bout and others to obtain airplanes and related aircraft services from companies in the United States on behalf of Samar Airlines, an airline company based in Tajikistan controlled by the defendant and Bout.  To purchase these planes, the defendant and Bout wired over $1.7 million from overseas bank accounts into the United States.  These transactions violated economic sanction laws against the defendant and Bout – sanctions that were enacted to strike against those who supported the regime of Charles Taylor, the former brutal dictator of Liberia.

#### 1.       Executive Order 13348 and the Defendant's Designation as an SDN

In July 2004, pursuant to the authority granted to the President by IEEPA, President George W. Bush signed Executive Order 13348, entitled "Blocking Property of Certain Persons and Prohibiting the Importation of Certain Goods from Liberia" (the "Executive Order").  (Tr. 74; GX 101).[1]  Pursuant to the Executive Order, and the federal regulations that were promulgated pursuant to the Executive Order, the United States designated as Specially

---

[1] "Tr." refers to the trial transcript; "GX" refers to Government exhibits admitted as evidence at trial; "Def. Ex." refers to the defendant's exhibits admitted at trial; and "PSR" refers to the Presentence Report.

Designated Nationals ("SDNs") certain individuals and entities that the U.S. Treasury Department determined had a close affiliation with, or provided significant support to, the regime of Charles Taylor in Liberia. (Tr. 75; GX 101). The SDNs were subject to various prohibitions set forth in the Executive Order and the attendant regulations. The assets of the listed SDNs that were within the United States or within the control of U.S. persons were frozen by the U.S. Treasury Department's Office of Foreign Asset Control ("OFAC") and could not be transferred, and any funds they were to send into the United States in the future would similarly be blocked. (Tr. 78-80; GX 101). In addition, individuals and entities in the United States, as well as any U.S. citizens at home or abroad, were prohibited from engaging in transactions with, or providing services of any kind to, the listed SDNs. (Tr. 79; GX 101). The Executive Order also prohibited any transaction by a United States person or within the United States "that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this order." (Tr. 80; GX 101).

Viktor Bout was listed as an SDN when the Order was first signed in July 2004. (Tr. 81; GX 101). The defendant and Viktor Bout's brother, Sergei Bout, were added to the SDN list in April 2005. (Tr. 85).

The day after his designation, the defendant was served by OFAC with a blocking notice, notifying the defendant of his listing as an SDN and informing him of the above-noted prohibitions. (Tr. 150-156; GX102-A). At the time the defendant received the blocking notice, the defendant told law enforcement that he knew Viktor Bout had previously been listed as an SDN. (Tr. 149). The defendant subsequently left the United States.

2.      The Samar Airlines Transaction

In around the summer of 2007, the defendant and Viktor Bout took over an airline in Tajikistan named Samar Airlines.  The defendant described this new venture in an email to Viktor Bout as a potential "goldmine."  (GX 2547).  That summer, in planning for the launch of Samar Airlines, the defendant and Bout traded numerous, detailed emails about the operation of Samar Airlines.  Specifically, they discussed: uniforms for airline employees (GX 2528); website designs (GX 2531); website passwords (GX 2535); logos for the airlines (GX 1613, 1654); insurance (GX 1711); and the hiring of employees (GX 2000-C, slides 50-51).

In or about June 2007, the defendant began contacting aircraft companies in the United States, including a company called GA Telesis, to purchase airplanes for Samar Airlines and for Mega Air, a company run by Sergei Bout.  (Tr. 426; GX 2540; GX 2518).  The defendant eventually located three aircraft that he wanted to purchase from owners located in the United States – a Boeing 727, a Boeing 737, and a McDonnell Douglas 83.  (GX 2547).  The defendant then contacted several people in the United States with whom he had transacted business in the past to complete the deal.  Chichakli contacted Henry Gayer and Allen Blattner, the principals of Aventura Aviation ("Aventura"), a company based in Florida, and made arrangements for them to reactivate the aircrafts and render the aircrafts flightworthy.  (Tr. 338-342; GX 21).  The defendant arranged to purchase the Boeing 727-200 for approximately $600,000, the Boeing 737 for approximately $700,000, and the McDonnell Douglas 83 for $3.6 million from companies based in the United States, including GA Telesis.  (GX 2547).

The defendant also contacted Robert Peacon, the principal of RP Aviation, also based in Florida, and made arrangements for Peacon to transport the aircraft the defendant sought to purchase from the United States to Tajikistan.  (Tr. 326, 451).  From that point forward, Gayer

4

and Blattner acted as intermediaries between the defendant and the owners of the aircraft to finalize the deal.  (Tr. 327-329).  For example, at the defendant's request, Aventura contacted GA Telesis, to purchase one of the airplanes for the defendant.  (Tr. 335, 337).

Aventura had previously engaged in airplane transactions with the defendant, and the company knew that the defendant always paid for his purchases.  (Tr. 315, 330, 331).  At the time of the Aventura transaction, Gayer knew the defendant had problems with the U.S. Government, but Gayer did not specifically know that the defendant had been designated by OFAC, and the defendant never told Gayer this fact.  (Tr. 403, 421).  Nor did the defendant tell Aventura about Bout's involvement in the deal. (Tr. 403).

In connection with the purchase of these aircraft and related ferrying services to transport the aircraft to Tajikistan, the defendant and Bout wired $1,732,576 million from several overseas bank accounts, on behalf of Samar Airlines, into bank accounts located in the United States belonging to the Aventura and RP Aviation.  (Tr. 347-350; GX 104).  The originating accounts for all of these wire transfers were not accounts held in the name of Samar Airlines.  (GX 104, GX 202, GX 204).  Instead, to distance the defendant and Bout from the transactions, the originating accounts for the transfers were several different accounts, located in Cyprus, Russia, and the Republic of Kazakhstan, and were held in the names of four other front companies controlled by Bout – Ilex Ventures, Ltd., Wartrex Holdings Limited, Aviakompaniya Mega, and Trinipac Enterprises Limited.  (Tr. 2086; GX 202; GX 204).

The defendant told Gayer when the funds would be arriving in Aventura's bank account and asked Gayer for wiring instructions.  (Tr. 347).  All payments that Peacon received for the airlines transaction also were from the defendant.  (Tr. 505, 596).  Documents found on the defendant's and Bout's computers also demonstrated that the defendant was responsible for the

payments to Aventura and RP Aviation.  (*See, e.g.*, 2000-C, slide 41).  Specifically, the

defendant's and Bout's computers contained banking information for Aventura and RP Aviation,

as well as emails between the defendant and Viktor Bout about payments to Aventura and RP

Aviation.  (GX 1707; GX 2000-C, slides, 98-100, 134).

      3.    <u>The Blocking of the Samar Airlines Transaction</u>

      In the middle of the defendant's dealings with Aventura, the Federal Bureau of

Investigation ("FBI") became aware of the transaction.  (Tr. 451).  FBI Agent William Hoffman

spoke with Peacon, and Peacon agreed to make recorded calls to the defendant.  (Tr. 451; GX

401, 401-T).  In one recorded call, the defendant, after being informed by Peacon that the FBI

had recently been to Peacon's house, told a series of lies.  The defendant told Peacon that his

name was "Raman," not Richard, and that they both should stay away from their "friend" in

Texas (referring to himself, the defendant).  (GX 401, 401-T).  In this call, the defendant also

falsely stated that he had no involvement whatsoever in the pending deal with Aventura

Aviation. (GX 401, 401-T).

      After this call, the defendant took steps to hide his involvement in the airplanes

transaction.  The defendant contacted Aventura, asking whether Aventura had a bank account

outside of the United States.  (Tr. 352-354; GX 2572).  The defendant also told Gayer, one of the

principals at Aventura, that all communication about the airplane contract should be addressed to

"Raman Cederov," one of his aliases.  (GX 2566).  Then, in a further attempt to disguise his

involvement in the transaction, the defendant called Aventura and told them that he would no

longer be working on the deal and, instead, Aventura should deal with someone at Samar

Airlines called "Anna Petrova," although the person who purportedly was "Petrova" used the

same email address the defendant used to communicate with Aventura.  (Tr. 363; GX 2573).

The evidence additionally showed that the defendant controlled the "Anna Petrova" email account. (Tr. 1435-36). In an email to Aventura, "Petrova" told Aventura to "clean and remove" all previous emails about the deal. (Tr. 377-379; GX 2573, GX 2575).

On September 11, 2007, Aventura sent the defendant an OFAC questionnaire, which was required for the deal to be completed the questionnaire and requested information about Samar Airlines, including its employees and whether any U.S. citizens were associated with Samar Airlines. (GX 2583). That same day, the defendant created business cards for a number of "employees" of Samar Airlines, to make it appear as though he did not work for Samar, but that others did. (2000-C, slides 66-67). The defendant also returned the OFAC questionnaire to Aventura. (GX 2584). The filled-out questionnaire omitted any reference to the defendant's and Viktor Bout's involvement in Samar Airlines. (GX 2583).

In or about September 2007, OFAC blocked and froze the entire $1.7 million that the defendant and Bout had wired to Aventura and RP Aviation. (Tr. 84; GX 103). The transaction was terminated, causing Aventura to lose over $70,000 the company had spent preparing the planes for the defendant and in legal fees after the funds were blocked. (Tr. 401-402).

4.      The Defendant's Fraudulent Efforts to Unblock the Funds

The defendant and Bout continued to conceal their involvement with Samar Airlines even after OFAC blocked the transferred funds. The defendant and Bout engaged a lawyer, Hal Eren, Esq., to fight OFAC's blocking of the money. (GX 2000-C, slide 162). However, the defendant and Bout hid their involvement in Samar Airlines to Eren, who believed he was representing Samar Airlines and who had been falsely informed that the defendant no longer had any association with Samar Airlines. (Tr. 1576, 1583, 1606). Eren expressed concern that the defendant's email account, rc@samarair.com, was still active, even after the funds had been

blocked and after Samar Airlines had represented that the defendant no longer worked for Samar. (Tr. 1591; GX 1662).  After the defendant alerted Bout to this problem, Bout advised the defendant to "create new emails to avoid future problems" and to "delete RC email effective immediately."  (GX 1662, GX 2000-C, slide 173).  The defendant subsequently communicated with Eren using a different email address associated with the name "Andrey Romanov."  (*See* GX 1000-C, slide 172).

Ultimately, the defendant and Bout submitted numerous documents to OFAC and others, including the United States Ambassador in Tajikistan, to try to get their money back.  These documents were created and edited on Bout's laptop computer (the "Bout Laptop") and the defendant's computers.  (GX 1000-C, slides 34, 66; GX 2619).  The documents contained numerous lies and misrepresentations, including claiming the defendant was merely a broker in the deal between Samar and Aventura and omitting anything about Bout's role in Samar Airlines.  (*See* GX 109; GX 104; GX 105).  For example, on or about September 14, 2007, Samar Airlines' purported Director General Demurov sent a letter to the United States Ambassador to Tajikistan stating, in substance, that Chichakli – who had extensive dealings with personnel from Aventura in connection with the airplane transaction – was not an owner, shareholder, or employee of Samar Airlines, and that his only involvement in the deal with the Aviation Company was that of a broker and consultant to facilitate the purchase of the two Boeing aircraft.  (GX 105).  Also, on or about December 11, 2007 and December 17, 2007, respectively, "Demurov" submitted two affidavits to OFAC stating, in substance, that Chichakli had acted solely as a broker who introduced Samar Airlines to the Aviation Company, and that the purchase funds for the aircraft deal were loaned to Samar Airlines.  (GX 104; GX 105).

Electronic copies of versions all of these documents were found on the Bout Laptop and on the defendant's computers.  (*See* GX 1000-C, 2000-C).

In preparing these fraudulent submissions to OFAC, the defendant emailed Bout requesting information about the wire transfer to Aventura and RP Aviation, stating, "[p]lease keep in mind that OFAC already has all the information about the wires and the money received, names and addresses of banks and senders, and all related data.  THEY ARE LOOKING FOR INCONSISTENT INFORMATION, so if any mistake in reporting the correct information is made they will have a good reason to delay the release if not refuse it."  (GX 1000-C, slides 174-177 (all caps in original)).  The defendant and Bout also created a fake, backdated loan agreement to make it appear as though an innocent third party had lent the $1.7 million to Samar Airlines, in an effort to get OFAC to release the money.  (1000-C, slides 55, 56, 199-200).  OFAC never unblocked the funds.

    5.    The Arrests of the Defendant and Viktor Bout

Viktor Bout was arrested on March 8, 2008, in Bangkok, Thailand. (Tr. 635, 649).  Law enforcement seized the Bout Laptop from Bout at the time of his arrest.  (Tr. 638, 639, 652-653; GX 602).

The defendant was arrested on or about January 9, 2013, in Melbourne, Australia, where he was living under the alias "Jehad Almustafa."  (Tr. 741).  At first, the defendant maintained that his name was "Jehad Almustafa," not Richard Chichakli.  After the defendant was arrested, the Australian Federal Police seized numerous computers from the defendant's residence.  (Tr. 742, 744, 747).  From the Bout Laptop and the defendant's computers, law enforcement recovered overlapping email correspondence between Bout and Chichakli about Samar Airlines; email correspondence between Bout, Chichakli and third parties about Samar Airlines; Samar

Airlines financial statements; and other corporate documents related to Samar Airlines. (*See* GX 1000-C; GX 2000-C).

**B.      Other Relevant Conduct**

Documents and other materials seized from the search of the defendant's home and computers in Australia after his arrest demonstrate that the defendant engaged in additional, uncharged IEEPA violations *even after* the Samar Airlines transaction was blocked by OFAC.

1.    The Defendant's Silverware Business

During pretrial hearings, the defendant's then-attorney informed that court that the defendant made money in Australia by selling silverware.  (6/4/2013 Tr. 9-10).  Evidence obtained from the search of the defendant's home in Australia show that he ran a silverware company called "Elegance of Nobility," which did business in the United States, in violation of his SDN listing.  (*See* DEA Report, dated March 27, 2014, attached hereto as Exhibit A).  Records obtained from PayPal show that the defendant made approximately $190,000 from this business, and that the defendant shipped silverware products to approximately 320 customers in the United States.  (*See* PayPal subpoena return, attached hereto on a CD as Exhibit B).

2.    The Defendant's Car Purchases

While living abroad, the defendant also illegally purchased numerous used cars from businesses in the United States that he had shipped abroad, presumably for re-sale.  For example, in December 2007, under the name "Jehad Almustafa," the defendant purchased a 2003 Mercedes Benz for $23,199 from a used car dealer in Plymouth, Indiana.  (*See* Bill of Sale and other documents related to purchase, attached hereto as Exhibit C).

In 2008, the defendant purchased a 2003 Nissan Murano from the Georgia Art Gallery in the United States.  The defendant arranged for another company, Metropolitan Shipping Logistics Company ("MSL"), located in New Jersey, to ship the Murano to Russia.  However,

the defendant and MSL had a dispute over whether the defendant paid the full amount for the shipment, with the defendant threatening to sue MSL.  Incredibly, the defendant, while still an SDN, filed a complaint under the name "Jehad Almustafa" against MSL with the Federal Maritime Commission ("FMC") in the United States concerning this dispute.   (*See* Defendant's email exchange with MSL and complaint filed with the FMC, attached hereto as Exhibit D).

## C.    The Guidelines Calculation

The Probation Department calculated the defendant's offense level to be 33, yielding a Guidelines range of 135 to 168 months.[2]  The Government disagrees with the Probation Department's Guidelines calculation.  Set forth below is the Government's Guidelines analysis.

    1.    <u>Grouping Analysis and Method of Calculating the Combined Offense Level</u>

The jury found the defendant guilty of all nine counts in the Indictment. Count One charged the defendant with participating in a conspiracy to violate IEEPA, in violation of Title 50, United States Code, Section 1705, and Title 18, United States Code, Section 371 (the "IEEPA Count").  Count Two charged the defendant with participating in a conspiracy to launder money, in violation of Title 18, United States Code, Section 1956(h) (the "Money Laundering Count").  Count Three charged the defendant with participating in a conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.  In Counts Four through Nine, the defendant was charged with six counts of substantive wire fraud, in violation of Title 18, United States Code, Section 1343 (collectively, with Count Three, the "Wire Fraud Counts").

---

[2] The Probation Department's calculation of the offense level for Count 2 (money laundering conspiracy) presumed that the offense underlying the money laundering conspiracy was wire fraud.  *See* PSR ¶ 37.  However, as explained at *infra* C.3.a, the underlying offense from which the funds were derived, for the purpose of Count 2, was the IEEPA violation.

All of the charges in the Indictment stemmed from the defendant's partnership with Victor Bout to obtain airplanes and related aircraft services from companies in the United States. As a result, for Guidelines purposes, the IEEPA Count, the Money Laundering Count, and the Wire Fraud Counts are grouped pursuant to Section 3D1.2 because they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." U.S.S.G. § 3D1.2(b).[3]  Pursuant to Guidelines Section 3D1.3, where counts are grouped pursuant to subsection (b) of Section 3D1.2, the offense level for the group is "the highest offense level for the counts in the group." U.S.S.G. § 3D1.3(a).  Accordingly, the offense level for the group consisting of the IEEPA Count, the Money Laundering Count, and the Wire Fraud Counts is the higher of the offense levels applicable to the three sets of counts.

2.      The IEEPA Count

   a.      Chapter 2 Offense Level

The Guidelines Section applicable to the IEEPA Count is U.S.S.G. § 2M5.1.  Under Section 2M5.1(a)(2), the offense base offense level is 14, because the offense did not involve evading national security export controls or export controls relating to the proliferation of nuclear, biological, or chemical weapons or materials, and also did not involve a financial transaction with a country supporting international terrorism.

   b.      Adjustment for Obstruction of Justice

Section 3C1.1 of the Guidelines provides for a two-level increase where, as relevant here, "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the

---

[3] Pursuant to application note 2 to Section 3D1.2, the "societal interests that are harmed" by the offenses charged in the IEEPA Count, the Money Laundering Count, and the Wire Fraud Counts "are closely related," and therefore the offenses involve the "same victim" under Section 3D1.2(b).

administration of justice during the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct."  U.S.S.G. § 3C1.1.  As the application notes to this Section make clear, the upward adjustment applies to a wide range of obstructive conduct, including "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."  U.S.S.G. § 3C1.1, comment., application note 4(g).

Here, the defendant repeatedly lied to OFAC by submitting false and perjurious declarations to OFAC hiding his and Bout's involvement in the airplane transactions, in an attempt to obstruct the investigation into his violations of economic sanctions.  These lies were made well after the defendant learned that he was designated as an SDN and also after he learned that funds were frozen by OFAC because he engaged in transactions in violation of that designation.  These false statements were material, because their purpose was to persuade OFAC to release the approximately $1.7 million that had been frozen.  U.S.S.G. § 3C1.1, comment., application note 6 ("'Material' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination.").  For the same reasons, there can be no question that the defendant "consciously acted with the purpose of obstructing justice" and that these false declarations were willful attempts to obstruct justice.  *United States* v. *Lincecum*, 220 F.3d 77, 80 (2d Cir. 2000) (citing *United States* v. *Case*, 180 F.3d 464, 467 (2d Cir.1999) and *United States* v. *Dunnigan*, 507 U.S. 87, 95 (1993); internal quotations marks and alterations omitted); *see also id.* ("Where the district court finds that the defendant has clearly lied in a statement made under

oath, the court need do nothing more to satisfy *Dunnigan* than point to the obvious lie and find that the defendant knowingly made a false statement on a material matter.").

Accordingly, a two-point enhancement under Section 3C1.1 is applicable.  The adjusted offense level applicable to the IEEPA Count is therefore 16.

       3.     The Money Laundering Count

          a.     Chapter 2 Offense Level

The Guidelines Section applicable to the Money Laundering Count is U.S.S.G. § 2S1.1. Under Section 2S1.1(a)(1), the base offense level is the offense level for the underlying offense from which the laundered funds were derived, if the defendant committed the underling offense, and the offense level can be determined.  The underlying offense from which the laundered funds were derived in this case was the IEEPA violation charged in Count One, and, as the jury found, the defendant committed this underlying offense.  Accordingly, the base offense level is 14, which is the base offense level for the IEEPA Count.

Under U.S.S.G. § 2S1.1(b)(2)(B), the base offense level is increased by two points, because the defendant was convicted of violating 18 U.S.C. § 1956.

Under U.S.S.G. § 2S1.1(b)(3), the base offense level is increased by an additional two points, because Section 2S1.1(b)(2)(B) applies, and the offense involved sophisticated laundering.  U.S.S.G. § 2S1.1, comment., application note 5(A) ("Sophisticated laundering typically involves the use of – (i) fictitious entities; (ii) shell corporations; . . . ; or (iv) offshore financial accounts" (emphasis added)).  The sophisticated laundering consisted of  using four front companies - Ilex Ventures, Ltd., Wartrex Holdings Limited, Aviakompaniya Mega and Trinipac Enterprises Limited - located abroad to make the illegal payments for the airplanes, in order to hide the defendant's and Bout's involvement in the transactions.

      b.  <u>Adjustment for Obstruction of Justice</u>

The false documents the defendant submitted to OFAC to hide his and Bout's involvement in the airplane transactions were obstructive with respect to the entire case.  *See supra* C.2.b.  Accordingly, a two-point increase in the offense level is applicable to the Money Laundering Count, and the adjusted offense level applicable to the Money Laundering Count is 20.

    4.   <u>The Wire Fraud Counts</u>

      a.    <u>Chapter 2 Offense Level</u>

The Guidelines Section applicable to the Wire Fraud Counts is U.S.S.G. § 2B1.1.  Under Section 2B1.1(a)(1), the base offense level is 7, because the offense of conviction (18 U.S.C. § 1349) carries a statutory maximum term of imprisonment of 20 years or more.

This base offense level is then increased under U.S.S.G. § 2B1.1(b) depending on the loss amount involved.  The applicable loss figure is the greater of the actual or intended loss.  *See* U.S.S.G. § 2B1.1, comment., application note 3(A) ("loss is the greater of actual loss or intended loss").

Here, the defendant arranged to purchase through Aventura a Boeing 727-200 for approximately $600,000, a Boeing 737 for approximately $700,000, and a McDonnell Douglas 83 for $3.6 million.  (GX 2547).   The defendant and Bout wired approximately $1.7 million for these planes into the United States, before OFAC froze the funds, terminating the airplane deal.  (Tr. 84; GX 103).  After the $1.7 million was rightfully frozen by OFAC because the defendant

and Bout were prohibited from engaging in transactions in the United States, the defendant submitted false information to OFAC to get this money back.

One of the Government's theories of the defendant's guilt on the Wire Fraud Counts, as argued by the Government to the jury and noted in the Jury Instructions given by the Court, was that the defendant conspired with Bout and others to defraud OFAC and other U.S. Government officials by making false representations about the nature of the transaction and the defendant's role in the transaction in order to secure the release of the frozen funds after the transactions were blocked.  Under this proven theory of guilt, the defendant intended to defraud OFAC out of the $1.7 million that OFAC had lawfully seized and that the Government was entitled to keep. *See* U.S.S.G. § 2B1.1, comment., application note 3(A)(ii) ("'Intended loss'" (I) means the pecuniary harm that was intended to result from the offense . . .").  Accordingly, the intended loss was approximately $1.7 million, resulting in a 16-level increase in offense level, because the intended loss was more than $1,000,000, but less than $2,500,000.

The offense level is increased by an additional two-level under U.S.S.G. § 2B1.1(b)(9), which provides for such an increase where the offense involved a violation of any prior specific judicial or administrative order, injunction, decree, or process.  Here, the defendant's offense stems from his designation by OFAC as a SDN, which prohibited the defendant from engaging in the Samar Airlines transaction.

The offense level is increased by an additional two-level under U.S.S.G. § 2B1.1(b)(10)(B), because a substantial part of the fraudulent scheme was committed from outside of the United States.  The defendant and Bout were living abroad at the time of the offense, the defendant negotiated the deal with Aventura from abroad, Samar Airlines was located in Tajikistan, and the money for the planes was wired from four foreign bank accounts.

Alternatively, the same two-level enhancement is appropriate under Section 2B1.1(b)(10)(C), because the defendant and Bout used "sophisticated means" to hide their involvement in the transaction, by concealing their identities, creating fake email accounts, and using front companies to wire money into the United States.  *See supra* C.3.a.

        b.    <u>Adjustment for Obstruction of Justice</u>

As previously noted, the false documents the defendant submitted to OFAC to hide his and Bout's involvement in the airplane transactions were obstructive with respect to the entire case.  *See supra* C.2.b.  Accordingly, a two-point increase in the offense level is applicable to the Wire Fraud Counts, and the adjusted offense level applicable to the Wire Fraud Counts is 29.

        4.    <u>Combined Offense Level and Guidelines Sentencing Range</u>

Based on the foregoing calculations, the offense level applicable to Counts One through Nine is 29 – the higher of the offense levels applicable to the IEEPA Count, the Money Laundering Count, and the Wire Fraud Counts.  *See* U.S.S.G. § 3D1.3.  In Criminal History Category I, this offense level yields a Guidelines sentencing range of 87 to 108 months' imprisonment.

## <u>DISCUSSION</u>

**A.**    **Applicable Law**

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range" — that "should be the starting point and the initial

benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined

in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense

and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four

legitimate purposes of sentencing, as set forth below, *see id.* § 3553(a)(2); (3) "the kinds of

sentences available," *id.* § 3553(a)(3); (4) the Guidelines range itself, *see id.* § 3553(a)(4); (5)

any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); (6) "the need

to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (7) "the need

to provide restitution to any victims," *id.* § 3553(a)(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence

sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**B.    A Guidelines Sentence is Appropriate**

As discussed below, the application of the factors under Section 3553(a) warrants a

sentence within the Guidelines range of 87 to 108 months.

1.    <u>Seriousness of the Offense</u>

This was a highly sophisticated, multi-million dollar offense.  Less than two years after

being personally notified of his status as an SDN, the defendant flagrantly violated IEEPA by

attempting to purchase airplanes worth over $4.9 million from companies in the United States, so that he could start an airline with Viktor Bout and make a large profit.  The defendant went to elaborate lengths to conceal his and Bout's involvement.  He used multiple identities, email accounts, and bank accounts to deal with Aventura and other airline companies in the United States.  The defendant and Bout paid for the planes using four front companies in Russia.  And when OFAC froze the defendant's money, he and Bout engaged in another elaborate fraud – they hired an attorney under fake pretenses and submitted numerous, perjurious documents to OFAC in an effort to unblock the frozen funds.

In addition, the defendant's co-conspirator, Viktor Bout, was an infamous arms trafficker, who was subsequently convicted of conspiring to sell weapons to a terrorist organization.  At the time the defendant committed the instant crimes, Bout had already been designated as an SDN for supplying weapons to the brutal Charles Taylor regime in Liberia, and the defendant knew of this designation.  For that reason, the defendant was prohibited from working with and providing any services to Bout.  Yet, despite knowing this about Bout, the defendant still chose to form an airline business with Bout, his long-time business partner.

The defendant's crimes also caused harm to other people, including the owners of Aventura Aviation.  As set forth in Henry Gayer's victim impact statement attached to the PSR, after the approximately $1.7 million was frozen, Aventura spent approximately $70,000 in legal fees to related to the Treasury Department's investigation.  After it became public that the defendant dealt with Aventura, other airline companies stopped doing business with Aventura, and Aventura's bankers closed down Aventura's business accounts and even the personal accounts of Aventura's owners.  To this day, Mr. Gayer suffers from "anger, anxiety, and

inability to now trust other people." He writes, "this case has taken a significant amount of my time and my company's time, and has taken a physical and mental toll on me and my family."

    2.    <u>The Need for the Sentence to Serve as a Deterrent and to Promote Respect for the Law</u>

As noted above, the defendant continued to violate IEEPA even after the Samar Airlines transaction was blocked by OFAC. When the Samar Airlines transaction was blocked, the defendant and Bout created another fraudulent scheme to get their money back. And even after the $1.7 million was frozen, the defendant continued to do business in the United States, in violation of IEEPA. He sold silverware to American customers, and bought used luxury cars from United States business. The defendant went so far as to file a complaint in 2008 under a fake name with the Federal Maritime Commission in the United States. That the defendant would seek to avail himself of the same legal system he sought to undermine by his own criminal conduct underscores his complete disregard for anything other than his own self-interest.

In sum, the defendant is a recidivist, with no respect for the law, who consistently puts his own desire to make money above U.S. law. A significant sentence is therefore needed to deter the defendant from engaging in further violations of IEEPA, money laundering, fraud, and other crimes.

A significant sentence is also needed to deter others from engaging in similar offenses. IEEPA violations typically involve foreign actors (like Viktor Bout), and span numerous countries and jurisdictions. Investigating and prosecuting such violations often require significant resources and international law enforcement cooperation. In this case, if Viktor Bout had not been arrested in Thailand and his laptop searched, the Government may not have been able to charge the defendant. The prosecution of the defendant required cooperation from law enforcement officials in Australia and Thailand, among other places. A substantial sentence is

therefore necessary here to counterbalance the lower risk of apprehension, and to demonstrate to others that the commission of this type of economic crime will result in significant penalties.

      3.    <u>The History and Characteristics of the Defendant</u>

As noted in the PSR, before leaving the United States in 2005, the defendant held numerous jobs and was a Certified Public Accountant.  (PSR ¶¶ 86-95).  He made a good salary, earning approximately $170,000 a year before he left the United States.  (PSR ¶ 86).  The defendant has a loving (if fractured) family, and numerous advanced degrees (PSR ¶¶ 74-83).  His crimes, while financially motivated, were certainly not motivated by need, and cannot be excused or mitigated by an imperfect understanding of the difference between right and wrong.  Based on his intelligence, background, and education, the defendant clearly understood that his conduct was wrong, illegal, and carried serious consequences.  Quite simply, he chose to violate the law because he wanted to make more money, and he thought he could get away with it.

      4.    <u>No Downward Departure is Warranted</u>

The defendant makes numerous arguments for downward sentencing departures, none of which is persuasive.   The defendant contends he is entitled to a downward departure due to his medical conditions and because of what he perceives as harsh conditions of confinement.  But the defendant provides no reliable evidence that he has been subject to conditions of confinement any harsher than the normal prisoner.  The defendant also fails to provide any evidence that he has received inadequate medical care while imprisoned. His request for a downward departure on these grounds should be rejected.

The defendant also contends that he entitled to a downward departure because since he was placed under sanctions by OFAC, his life and business have been destroyed.  He analogizes to a case in which a court granted a downward departure because a defendant's business was

closed after his conviction.  *See United States* v. *Gaind*, 829 F.Supp. 669 (S.D.N.Y. 1993).

However, as the offense conduct in this case makes clear, the defendant's life was far from

destroyed after being sanctioned by OFAC in 2005.  The defendant moved to Russia, got re-

married, continued working with Victor Bout, a sanctioned arms trafficker, and attempted to

purchase multi-million dollar planes for a business he and Bout hoped would be a goldmine.

The defendant contends he is entitled to a downward departure because he claims that

one of the regulations he was convicted of violating did not exist at the time of his crime.  This

argument was advanced by the defendant at trial and rejected by the jury at trial, because it does

not matter whether the regulation existed at the time of the offense.  The Executive Order, which

had the force of law, existed at the time, and there is no dispute that the defendant was aware of

the Executive Order, as the defendant was personally served with a blocking notice (that he

signed) informing him of his SDN designation.  (Tr. 116, 150).

The defendant also contends that he is entitled to a downward departure because he

suffers from Post-Traumatic Stress Disorder ("PTSD") resulting from his time in the Army.  The

defendant provides no documentation or report from any physician confirming that he in fact

suffers from PTSD.   Nor is there anything in the record to suggest that the defendant had any

traumatic experiences during the three years he served in the Army as an air traffic controller.

His undocumented, last minute claim of suffering from PTSD does not warrant a downward

departure.

The defendant contends that he is entitled to a downward departure because the

Government manipulated the indictment and failed to disclose *Brady* materials.  These

arguments have already been rejected by the Court during pre and post-trial motion practice.

(See Doc. No. 229, pp. 28-29; Doc. No. 70, pp. 1-5).

The defendant argues that because he is 56 years old, he represents a low risk of recidivism. While it may be true that, as a general matter, older defendants present a lower risk of recidivism, the defendant's conduct here demonstrates that he does not fall into this general category. The defendant has displayed no remorse, and has failed to accept any responsibility for his crimes. Because he believes he did nothing wrong, there is a high risk that he will engage in similar criminal conduct in the future. Further, the defendant's continued violations of the law even after the Samar Airlines transactions were blocked are proof that he presents a high risk of recidivism.

Finally, the defendant argues that he should receive credit for attempting to cooperate with United States law enforcement after the blocking of the Samar Airlines transaction. The defendant did contact United States law enforcement while he was living abroad. But, each time, the defendant insisted that he would not provide information unless the sanctions against him were lifted or the charges against him were dismissed. (*See* Doc. No. 91 (detailing the defendant's failed attempts to cooperate); Doc. No. 70 (precluding the defendant from offering evidence of his failed attempts to cooperate)). These requests were rejected by law enforcement and the defendant never cooperated. His should receive no credit for his failed cooperation efforts.[4]

---

[4] The defendant also argues he is entitled to a downward departure because he was convicted under an aiding and abetting theory. This is inaccurate. While he was convicted under an aiding and abetting theory of criminal liability on the substantive wire fraud counts, he was also convicted of participating in three separate conspiracies (IEEPA, money laundering, and wire fraud). Moreover, the defendant played a primary role in all of the offenses he was convicted of – the defendant found the planes, communicated with Aventura, and ran Samar Airlines with Victor Bout.

**C.**     **The Court Should Order Restitution to Aventura Aviation in the Amount of $70,000**

As noted above, Aventura Aviation was a victim of the defendant's crimes and paid

$70,000 in attorney's fees as a result of these crimes.  As such, Aventura Aviation is entitled to

$70,000 restitution.[5]

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully requests that the Court

impose a sentence within the applicable Guidelines range of 87 to 108 months' imprisonment,

and order restitution to Aventura Aviation in the amount of $70,000.

Dated:  New York, New York
        November 21, 2014

                            Respectfully submitted,

                            PREET BHARARA
                            United States Attorney


                    By:     _____/s/_____
                            Ian McGinley/Christian Everdell
                            Assistant United States Attorney
                            Tel.: (212) 637-2257/2556

---

[5] Before sentencing, the Government will file, under separate cover, proposed orders of
restitution and forfeiture.

# EXHIBIT A

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 5

| 1. Program Code | 2. Cross File | Related Files | 3. File No. ▮▮▮▮ | 4. G-DEP ▮▮▮▮ |
|---|---|---|---|---|
| 5. By: Paul T Larsen, SA<br><br>At: Special Operations Division (OS) | ☐<br>☐<br>☐<br>☐<br>☐ | | 6. File Title ▮▮▮▮ | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | | 8. Date Prepared<br>03-27-2014 | |
| 9. Other Officers: | | | | |

10. Report Re: Acquisition of Exhibit N-279 and summary of information sent by eBay about Richard CHICHAKLI's accounts

**INVESTIGATIVE CAVEAT: The information detailed herein involves an ongoing sensitive investigation. The contents of this report require protection against unauthorized disclosures to safeguard investigative sources and methods. Receipt of this document does not imply consent by originating offices for further dissemination. Recipients should not further disseminate this information, in whole or in part, without the expressed and collective consent of the Special Operations Division (SOD) Bilateral Investigations Unit (BIU).**

SYNOPSIS:

1. Special Operations Division personnel received information provided by eBay in regard to accounts connected to Richard CHICHAKLI. The following is a summary review of that information.

DETAILS:

1. In 2005, officials with the U.S. Department of Treasury listed Richard CHICHAKLI on its Office of Foreign Assets Control list, which, in part, prohibited CHICHAKLI from doing business in the United States.

2. In 2009, a federal grand jury in the Southern District of New York returned indictments against CHICHAKLI and Viktor BOUT on charges of conspiracy to violate the International Emergency Economic Powers Act (IEEPA), money laundering, and wire fraud. The charges stemmed from the attempted purchase in 2007 by BOUT and CHICHAKLI (using SAMAR AIR

| 11. Distribution:<br>Division<br><br>District<br><br>Other   SARI | 12. Signature (Agent)<br><br>Paul T Larsen, SA | 13. Date<br>05-19-2014 |
|---|---|---|
| | 14. Approved (Name and Title)<br>/s/ Lawrence A Baumeister, GS | 15. Date<br>05-21-2014 |

DEA Form    - 6
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. ▉▉▉▉▉▉ | 2. G-DEP Identifier ▉▉▉▉ |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | 3. File Title ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ | |
| 4. Page 2 of 5 | | ▉ | |
| 5. Program Code | | 6. Date Prepared 03-27-2014 | |

in Tajikistan) of an aircraft in the United States through AVENTURA AVIATION, a company in south Florida.

3. In January 2013, Australian Federal Police arrested CHICHAKLI in Melbourne, Australia. Officers with the AFP executed a search warrant at CHICHAKLI's home, 51 Churchill Ave., Reservoir, Melbourne. AFP agents subsequently provided SOD agents with evidence recovered from that home, which CHICHAKLI shared with his wife, Yuliya FLYAGINA. (Agent's note: Investigators learned CHICHAKLI once lived at 61 Arundel Ave., Reservoir, Melbourne.)

4. At the time of his arrest, CHICHAKLI was using the alias of Jehad ALMUSTAFA.

5. One of the items turned over was a rectangular box addressed to "J Almustafa" at the Arundel Avenue address. The sender was listed as Dustin Wise, 1803 Brighton Point, Atlanta, Ga., 30328. The sender's signature box was dated February 9, 2012. Inside the box was a wall art poster of $1 United States currency bills.

6. Another item provided to SOD agents was a United States Postal Service receipt dated January 17, 2012. The sender was listed as Glenn Wilson of 303 E. Pressley Ave., Mooresville, N.C., 28115. The label was addressed to "Almustafa" at the Arundel Avenue address. The label listed as contents one "used ladies quartz wristwatch" valued at $850.

7. In addition, AFP investigators provided a picture of a different box, this one addressed to "Elegance of Nobility." The sender was listed as WJ Hagerty & Sons Ltd., Inc., 3801 W. Linden Ave., South Bend, Indiana, 46624. A date was not visible on the box. (Agent's note: During one of CHICHAKLI's initial hearings in the Southern District of New York, CHICHAKLI told the court that he earned money in Australia by selling silverware. Open-source reporting indicated WJ Hagerty & Sons was a jewelry/silver business with an address on Linden Avenue in South Bend, Indiana.)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** | | | |
| *(Continuation)* | | 3. File Title | |
| 4. Page 3 of 5 | | | |
| 5. Program Code | | 6. Date Prepared 03-27-2014 | |

8. Information from the search also indicated CHICHAKLI had ties to eBay and PayPal.

9. In February 2014, SA Paul Larsen sent a subpoena to eBay/PayPal. The subpoena requested all records of transactions involving the following names or people, addresses, and companies: Jehad Almustafa, Jehad J. Almustafa, Jay Mustafa, Yuliya Flyagina, "Elegance of Nobility," 51 Churchill Ave., Reservoir, Victoria, Australia, 3073; and 61 Arundel Ave., Reservoir, Victoria, Australia, 3073.

10. On March 12, 2014, SA Larsen received information from eBay via computer.

11. SA Larsen reviewed the information sent by eBay/Paypal.

12. PayPal provided the following information:

- E-mail address, jm@solarchoice.net, listed the user name as Jehad Almustafa; with a business name of Elegance of Nobility; along with the Arundel Avenue and Churchill Avenue addresses; account created on July 9, 2010.
- E-mail address of jm@solarcps.com, listed the user name as Jay Almustafa, along with the Arundel Avenue and Churchill Avenue addresses; account created on January 20, 2011.
- E-mail address of supervic08@hotmail.com, listed the user name as Yuliya Flyagina, along with the Arundel Avenue and Churchill Avenue addresses, along with 3/17 Station St., Reservoir, Victoria; account created on July 10, 2010.

13. Ebay provided the following registration information for user identifications:

- hagertyaustralia, full name of Jay Mustafa, e-mail address of jm@hagertyau.com, with the Arundel Avenue address for contact information; and a registration date of June 22, 2012.
- aussietea1, full name of J Almustafa, e-mail address of jm@solarchoice.net, with the Churchill Avenue address for contact

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. File No. ▓▓▓▓▓▓ | 2. G-DEP Identifier ▓▓▓ |
|---|---|---|
| | 3. File Title ▓▓▓▓▓▓▓▓▓▓▓▓ | |
| 4.<br>Page   4   of   5 | | |
| 5. Program Code | 6. Date Prepared<br>03-27-2014 | |

information; and a registration date of July 3, 2010. In the section of shipping address history, the document noted an address of Jay Mstafa (sp), Wilson Avenue, Unit C, S2AJM00359, Newark, NJ, 07105, US, 856 537 8483.

- australiag1, full name of Jay Mustafa, e-mail address of jm@solarcps.com, with the Arundel Avenue address for contact information; and a registration date of January 19, 2011.
- supervic2010, full name of Yuliya Flyagina, e-mail address of supervic08@hotmail.com, with the Churchill Avenue address for contact information; and a registration date of July 10, 2010.

14. In regard to the account of jm@solarchoice.net, the PayPal documents showed the total amount sent was $4,215.27 USD and a total amount received of $190,915.11 USD.

15. For the account of jm@solarcps.com, the PayPal documents showed the total amount sent was $293.87 USD, while the total amount received was $51.08 USD.

16. The third account, supervic08@hotmail.com, sent a total of $21.32 USD and received a total of $18,776 USD.

17. During a review of the transactions for jm@solarchoice.net, SA Larsen noted that the above-mentioned paperwork related to Dustin Wise and Glenn Wilson were found on lines 2536 and 2670, respectively. During that review of jm@solarchoice.net, SA Larsen counted approximately 320 shipping addresses in the United States. Additionally, the items involved in the transactions on jm@solarchoice.net mostly involved silverware/jewelry related items.

18. Transactions for jm@solarcps.com seemed to center mostly on cellular telephone accessories.

## CUSTODY OF NON-DRUG EVIDENCE:

1. Exhibit N-279 was a compact disc containing 13 documents provided by eBay to SA Paul Larsen via computer on March 12, 2014. SA Larsen subsequently downloaded the documents to a computer and on May 19, 2014, downloaded the documents to the compact disc. SA Larsen sealed the compact disc in a DEA self-sealing evidence envelope (ES000961065), which was later transferred to the Non-Drug Evidence Custodian at the Special Operations Division.

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION *(Continuation)* | 1. File No. ▓▓▓▓▓▓▓ | 2. G-DEP Identifier ▓ |
|---|---|---|
| | 3. File Title ▓▓▓▓▓▓▓▓▓ | |
| 4.<br>Page 5 of 5 | | |
| 5. Program Code | 6. Date Prepared<br>03-27-2014 | |

**INDEXING:**



1. CHICHAKLI, Richard — ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2. BOUT, Viktor ▓▓▓▓▓▓▓

3. FLYAGINA, Yuliya — ▓▓▓▓▓▓

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

# EXHIBIT B

(Hard Copy Only)

# EXHIBIT C

(Please use CAPITAL LETTERS to fill this application form)

**REQUEST FOR** ☐ **Telex Transfer** ☐ **Mail Transfer** ☐ **Demand Draft**

☐ To advise and Pay ☐ To advise and credit the account ☐ Payable in (country) _____

☐ To pay on identification

For Amount of | Currency | Amount
USD | 23,500 =

Amount (in words) Twenty Three thousand and Five hundred only

| Beneficiary Name & Address | QASWA MOTORS |
| Account No. (If applicable) | 5201670709 |
| Beneficiary's Bank Details | LASALLE BANK, NA |
| Special Instructions (if any) | ABA # 071000505 |

In Reimbursement ☑ Debit the value plus charges to my/our Account `9 1 5 7 8 4 3 4 2 4` with Shj ( Branch )

☐ Receive Cash

☐ Receive Cheque No. _____ for _____ Drawn on Bank _____

I/We agree to the terms and conditions stated overleaf

Applicant's Name Machines World

Address _____

Telephone No. 050/3566800

Name of remitter (If other than applicant) _____

Applicant's Signature

IOTI (E) R (7/99) (02/2007)

16 DEC 2007

---

Mercedes Purchase

### Please send: $23,500
The purchase price of 2003 Mercedes S500, VIN#: **WDBNG84J23A361262**

To:        QASWA MOTORS
Account #: 5201670709
Bank:      LASALLE BANK, NA
ABA#:      071000505

**Beneficiary Info:**

QASWA MOTORS, INC

7575 Michigan Rd
Plymouth, IN 46563
Lasalle Bank Acct#: 5201670709

**Bank Info:**

LaSalle Bank, NA

**BILL OF SALE/MEMORANDUM OF INSTALLMENT SALE**

All identifying numbers on said vehicle agree with those on the certificate of title or statement of origin.

Signed _____
Subscribed and sworn to before me this _____
day of _____, 20____   Notary Public
for _____ County, State of _____
Notary Public _____

Purchaser  Jehad Almustafa
PO Box 5265, Fujairah Free Zone, Fujairah NA UAE

Salesman  Shafi                    Phone _____

| MAKE OF CAR | BODY STYLE | SERIAL NUMBER | STOCK NUMBER |
|---|---|---|---|
| 2003 MERCEDES | S500 4MATIC | WDBNG84J23A361262 | A361262 |

**TRADE IN**

I HEREBY ACKNOWLEDGE RECEIPT OF THE FOLLOWING ITEMS:
1. completed copy of the retail installment contract.
2. Certificate of title.
I have read my contract and understand my payments and charges in full.

x _____

Paid In Full
Paid

Cash Price ......... $ 23000
Sales Tax .........     799
Del. and Handling .
Total Price ....... 23799

Previous Deposit ......
Cash on Delivery ......  23799 wire transfer
Net Trade Allowance ..
Total Credit .........
Unpaid Balance

**NO PUBLIC LIABILITY**
INSURANCE ISSUED
WITH THIS TRANSACTION

QASWA Inc.
9575 Michigan Rd
Plymouth IN 46563

Which is secured by a retail installment contract and judgment not executed by the undersigned on this date. Additional charges and insurance included in the retail installment contract are as follows:

NOTES AND RETAIL INSTALLMENT CONTRACT HELD BY:

| PAYMENTS OF | EACH | FIRST PAYMENT DUE |
|---|---|---|

Make of Car _____
Serial Number _____
Motor Number _____
Allowance .......... $ _____
Less Amount Owing . $ _____
Net Allowance ...... $ _____

I state that odometer mileage on VEHICLE BEING PURCHASED described above is _____ at time of transfer
(Check the following if applicable)
☐ I further state that the actual mileage differs from the odometer reading for reasons other than odometer calibration error and that the actual mileage is unknown.

x _____
Signature of Transferor's (Dealer or Authorized Agent)

The purchaser represents and warrants that he is of legal age; that he has title to and good right to sell and dispose of the used car traded in, described above, that there are no liens, claims, and/or encumbrances thereon, and agrees to furnish good and sufficient title and hereby grants the above company power of attorney to assign and endorse said title for him.

**The information you see on the window form for this vehicle is part of the contract. Information on the window form overrides any contrary provisions in the contract of sale.**

I state that odometer mileage on USED VEHICLE TRADED-IN described above is _____ at time of transfer.
(Check the following if applicable)
☐ I further state that the actual mileage differs from the odometer reading for reasons other than odometer calibration error and that the actual mileage is unknown.

x _____
Signature of Purchaser (Transferor of Trade-In)        Date

I approve and accept the above terms _____
                                          PURCHASER

**AS IS** - All used cars "as is" - unless indicated here.    eBay item # 160186714380

In the event out of out of state sales, title to the above described vehicle shall remain in the seller until said title is endorsed to and received by the purchaser through the U.S. Mails.
Payments required to be made hereunder are not acceptable to seller unless made in cash or until conditional payments have cleared purchaser's bank. I, THE PURCHASER, HAVE READ AND UNDERSTAND THE RETAIL INSTALLMENT CONTRACT WHICH HAS BEEN SIGNED BY ME, AS WELL AS THIS MEMORANDUM, AND BOTH THE RETAIL INSTALLMENT CONTRACT AND THIS MEMORANDUM OF INSTALLMENT SALE HAVE BEEN FILLED OUT BEFORE I SIGNED THEM AND I HAVE RECEIVED A COPY OF BOTH DOCUMENTS AND DO ACKNOWLEDGE DELIVERY OF THE ABOVE DESCRIBED AUTOMOBILE. THESE DOCUMENTS CONSTITUTE THE ENTIRE AGREEMENT BETWEEN US AND I HEREIN STATE THAT NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME WHICH ARE NOT HEREIN SET FORTH.

By _____
   SELLER-AUTHORIZED DEALER

M & D AUTO DEALER SUPPLY, INC., (219) 365-9055

# EXHIBIT D

Thursday, February 21, 2008

**Federal Maritime Commission**
**Office of Consumer Affairs and Dispute Resolution Services**
**800 N. Capitot Street NW,**
**Washington, DC 20573**

> Subject:    **Complaint against Metropolitan Shipping Company, Briz**
>             **Forwarding, Inc. FMC#4026, and International Forwarding Co.**
>
> Reference:   **Bill of Lading# WR-9064, Booking: HOU195157**

Gentlemen:

This memorandum is being filed with your commission to lodge a complaint and seek resolution by the undersigned, Jehad J. Almustafa (*complainant*) , an individual shipper of a motor vehicle; being a 2003 Nissan Murano SE, from the port of New York, NY (*origin*) to the port of Klaipeda, Lithuania (*destination*).

On December 17, 2007 the complainant contracted Metropolitan Shipping Company (*hereinafter called: MSL*) via E-mail communication (see attachment: Email_6 and Email-5) to ship Complainant's personal vehicle; being an SUV identifiable as 2003 Nissan Murano SE AWD, VIN# JN8AZ08W33W234500, from the United States to Lithuania, Door-to-Port service. Complainant entered into this agreement relaying on verbal and written presentations about the capabilities of MSL made over the phone by Alec Yanis, an officer of MSL holding the office of the Vice President, and further relaying on information posted on the internet at www.mslship.com where shipping quote #OCN10097 was provided to Complainant..

MSL offered Complainant's vehicle for the total sum of US $1,305 for freight charges, plus US$ 300 for full insurance fee, for a grand total of US $1,605.00 inclusive of the freight and full-coverage insurance premium broken down as follows:

| | | |
|---|---|---|
| 1- Inland transportation fee: | $430.00 | (see atch.: NissanMurano_InLandTrans_Inv) |
| 2- Ocean Freight fee: | $800.00 | (see atch.: NissanMurano_OceanFreight_Inv) |
| 3- Document fee: | $75.00 | (see atch.: NissanMurano_OceanFreight_Inv) |
| **Total freight fee:** | **$1,305.00** | |
| 4- Full-coverage Insurance fee: | $300.00 | |
| **Grand Total: $1,605.00** | | |

Victoria Ovstrovsky, the General Manager of MSL promised that MSL had a container slotted for early January and is ready to be loaded (see atch: Email-2), and that Complainant's vehicle will be loaded into the said container should payment is made immediately. On December 20, 2007 Complainant effectively ordered payment to MSL via bank-to-bank wire transfer, and notified MSL about the payment details confirming that the payment was sent (see atch: Email_Payment_Sent). The payment was received and deposited into MSL account on December 26, 2008 (see atch:

Rcpt_of_shipping_pay_for_Murano).  In order to ensure that all requirements are met and avoid any delays, Complainant had also MSL's shipping form (see atch: NissanMurano_SHIPPING_Form) completed and returned to MSL on December 20, 2008 (see atch: Email_shipping_forms_Sent).  There was no further communications from MSL since December 20, 2008 despite that Complainant's numerous calls to their offices.

On January 7th, 2008 Complainant received an invoice from MSL demanding payment of US 430.00 for the inland transportation of Complainant's vehicle. Immediately, Complainant responded by calling MSL's General Manager, Victoria Ovstrovsky and requested explanation of MSL' demand given that he had already made payment for the entire shipping charges including insurance. The General Manager of MSL replayed stating that that the invoice showing balance due was sent in an error and she asked Complainant to discard the invoice, verbally, and in writing via E-mail (see atch: Email_Acknowledge_Payment) promising that the vehicle is already at the loading doc and it will be loaded within the week of January 7th (see atch: Email_Acknowledge_Payment.) Complainant, now becoming worried after observing MSL's unusual handling of his business by repeatedly issuing false statement, and changing their quotes and related charges (see the attached copies of E-mails for the changing quoted rates seen in several communications) , in addition MSL's persistence in not answering phone calls and e-mails. Complainant firmly requested that shipping document and voyage details be sent to him within no more than 10 days. Ms. Ovstrovsky promised to send the details without delay.

During the following 15 days after MSL promised on January 7th, 2008 to load Complainant's vehicle and send the Bill of Lading (see atch: Email_Acknowledge_Payment), Complainant made numerous telephone calls to inquire about the progress. MSL failed to return any of the Complainant's E-mails or phone calls, thus, prompting Complainant to write MSL On January 21, 2008 promising to get the authorities involved and to take legal actions should MSL fail to respond to his inquiry about his vehicle and the promised shipping documents. MSL's General Manager responded stating that they again failed to load Complainant's vehicles as she previously promised, and in the same time issuing a new promise to have the vehicle loaded by February 3rd, 2008. (see atch: Email_7.) Complainant having already being subjected to more than a month of anguish and distress, had no venue for remedy but to accept MLS new promise of a smooth sailing, and conveyed his acceptance via email (see atch: Email_7)

On Monday February 11th, 2008 now well into the third month of this never-ending saga, and after his numerous messages left on MSL's voice mail went unanswered, Complainant sent MSL an E-mail requesting updates concerning the promised shipping and fate of the shipping document required to clear the vehicle at destination (see atch: Email_3.)  Totally unexpected, MSL answered on Feb/11/2008 by issuing a new demand for payment of shipping fee showing two invoices marked unpaid (see atch: NissanMurano_InLandTrans_Inv       and       NissanMurano_OceanFreight_Inv.)     Complainant immediately called MSL offices and, again left a lengthy voice mail explaining that payment was made and the issue was previously cleared in writing as shown in the attached e-mails, and once more restated the details of the wire transfer. Complainant further asked that MSL to show that that vehicle was shipped fully-insured and provide receipt for the paid premium and information about the insurance company used by MSL to provide coverage.

MSL, unsurprisingly, failed to respond to seven additional telephone calls requesting reconfirmation regarding the settlement of payment, and tracking information for the shipping document, thus, prompting Complainant to, again send a written request asking for the information. (see atch: <u>Request_tracking</u>)

On February 20, 2008 Complainant received a response from Alec Yanis, the Vice President of MSL stating again, that he will not send or release the shipping documents be cause he was not paid! (see atch: <u>Email-1</u>) Complainant wrote back to Metropolitan Shipping Company to inform them that they were paid, and that he will get the authority involved because such mishandling of people business should not continue, (see atch: <u>Promise_of_action</u>).

Now comes Complainant asking that the Federal Maritime Commission take action against those involved in this matter including but not-limited to the handling agent: METROPOLITAN SHIPPING COMPANY (*MSL*), located at 1160 State Street, Perth Amboy, NJ 08861, telephone number (732) 324-0025, and against BRIZ FORWARDING, INC (*BF*). FMC#4026 being the Forwarding Agent, and against INTERNATIONAL FORWARDING COMPANY (*IFC*), telephone (718) 417-3096, being the Booking Agent of my shipment for:

1-   Recovery of Complainant's original shipping documents, and immediate forwarding of the said documents to the consignee

2-   Recovery of the reminder of the payment made into MSL's bank account in excess of the amount used for ocean freight and inland transportation

3-   Placing a lien and claim as permitted by law, against the Bond maintained at the FMC by MSL, BF, IFC, and all other involved parties, collectively and individually, to pay for damages and loss because of MSL failure to secure insurance for Complainant's vehicle as instructed, and to recover the premium placed in-trust with MSL to pay for insurance premium.

4-   Placing a lien and claim as permitted by law, against the Bond maintained at the FMC by MSL, BF, IFC, and all other involved parties, collectively and individually, to pay for financial damages suffered by Complainant because of MSL's  intentional false and misleading statement, including damages maybe suffered as results for MSL's attempt to defraud Complainant of the insurance premium, freight charges, and other fees.

5-   Any other remedies permissible by lay

Respectfully

Jehad J. Almustafa
Complainant

**YAHOO!** MAIL Classic

Print - Close Window

| | |
|---|---|
| **Date:** | Wed, 20 Feb 2008 11:57:30 -0800 (PST) |
| **From:** | "Jehad Jumaa" <jmgulf@yahoo.com> |
| **Subject:** | Re: Documents for Shipping Nissan Murano to Lith. |
| **To:** | nfbizz@aol.com |
| **CC:** | "Victoria Ostrovsky" <vo@metropolitanshipping.com> |

THIS MISHANDLING GOT HAVE TO BE STOPPED. YOU GOT PAID $1,650 ON DEC/27 VIA WIRE TRANSFER ACOUNT, THE TRANSFER CAME TO YOU FROM CBARE BANK IN RUSSIA.   YOU WILL HAVE TO TO BE SUED TO LEARN HOW TO DO BUSINESS.

*nfbizz@aol.com* wrote:

> Hello,
>
> this car 2003 NISSAN  MURANO SE  234500  is not paid for shipping,therefore we can not send docs and make release. Pls arrange for a payment or if payment was made - confrim the payment.
>
> Thank you for using MSL company!
>
> ALEC YANIS,
> V.P. of MSL Co.
>
> 1160 State Street, Perth Amboy, NJ, 08861
> Phone +732-324-0025 ext# 101 Fax +732-324-0027
> Mobil +917-412-3231
> Website: www.MSLSHIP.COM
> E-mail: AY@MSLSHIP.COM
> E-mail: NFBIZZ@AOL.COM
>
> NOW MSL OFFERS A NEW VARIETY OF EXTRA SERVICES TO OUR VALUED CUSTOMERS:
>
> An expert estimate by licensed adjuster if you have purchased a damaged vehicle and would like to acquire automobile parts before loading and shipping it in a container overseas.
>
> Order auto parts for your vehicle with MSL new/used parts department. Our prices are unbeatable!
>
> We can help you to order and program car keys in case they have been lost, stolen or if you bought the car without them.
>
>
> -----Original Message-----
> From: Jehad Jumaa <jmgulf@yahoo.com>
> To: Victoria Ostrovsky <vo@metropolitanshipping.com>
> Cc: ay@mslship.com
> Sent: Tue, 19 Feb 2008 11:40 am
> Subject: Documents for Shipping Nissan Murano to Lith.
>
> Dear Ms. Victoria:
> Good day.
> I inquired with Mr. Victor Flyagin - the consignee for the 2003 Nissan Murano you shipped for us to Lithuania and he appears no to have received the originals yet. I wounder if you can forward the tracking number to insure that we receive the documents timely considering that the vehicle's ETA is about 2 weeks away. The address of the consignee is provided below again in Russian and English for your quick reference.
> Thank you
> JJ
> **CONSIGNEE DETAILS:**
>
> in Russian:
>
>
>         Ôëÿãèí Âèêòîð
>         óë.Ñèðåíåâàÿ, ä.5

**Òâåðü, 170004 Đîññèÿ**
**Tel: +7 910 536-0006; +7 920 680-1348**

in English:

**Victor Flyagin**
**ul. Sirenevaya, dom 5**
**Tver, Russia 170004**
**Tel: +7 910 536-0006; +7 920 680-1348**

*Victoria Ostrovsky <vo@metropolitanshipping.com>* wrote:

Dear Jehad,

As per our phone conversation I confirm that your car is in our yard. WE appreciate your concern and tomorrow will make pictures again to confirm that car was not lost and it has the same milage.

To our regret during entire month since we received youcar and payment was made we shipped only one container to Klaipeda that was not FCL. We were not able to find consolidation for your car. The next opportunity to load it will be only on the vessel CMA CGM ELBE V.196E, c/ 2.04.08  with ETA to Klaipeda on 3.02.08.

We sincerely appologize for any inconvinience this delay could have caused you. Please let us know if you would like this car still to be shipped or if you would choose to make other arrangements.

Regards,

Victoria Ostrovsky,
General Manager.

Metropolitan Shipping Logistics Co.
1160 State Street, Perth Amboy, NJ, 08861
Ph. 732-324-0025, x102
Fax 732-324-0027
Website: www.MSLSHIP.COM
E-mail: VO@MSLSHIP.COM

-------- Original Message --------
Subject: RE: MSL OPEN INV 10625
From: Jehad Jumaa <jmgulf@yahoo.com>
Date: Mon, January 21, 2008 4:42 pm
To: Victoria Ostrovsky <vo@metropolitanshipping.com>

*Ms. Victoria Ostrovsky*
*Metropolitan Shipping Logistics Co.*
*1160 State Street, Perth Amboy, NJ, 08861*
Dear Ms. Ostrovsky:
On December 20, 2007 we made payment in the amount of US $1,650 via wire transfer to your account in payment for shipping charges our vehicle to Klaipeda, Lithuania. You picked-up the subject vehicle; a 2003 Nissan Murano, and the original title and acknowledged having it in your care, custody, and control also in December, the month you promised to have the vehicle shipped-out by your Mr.Yanis, and personally by yourself.

However, upon receiving an invoice from on January 2nd, 2008 demanding payment for shipping charges, we realized that something is severely wrong and I communicate with you by phone and by E-mail several times to resolve the issues of the delayed shipping and wrong billing. I spoke with you several times and you promised every time that the vehicle would be shipped in the next 4-5 days; unfortunately, all your promises thus far were proven false.
Therefore, we are now under the impression that you either misplaced our vehicle, or fraudulently charged us for services you did not render. Your lack of communication and the repeated making of false statements are highly unusual and are the cause of our concern.
Your action had already caused severe interruption to our business and significant financial

loos for which we shall hold you liable.

We are at this time communicating with you as a last attempt to resolve this issue prior to referring this matter to the United States Customs, and pursue available legal venues to recover for the looses your irresponsible acts caused. I urge you to provide us with a clear, correct, and concise statement of fact explaining the cause for not shipping our vehicle as contracted; asserting the existence of our assets in your custody in the same conditions, you received it, and acknowledge receiving payment.  If our vehicle still exist and is not damaged by your cause, we further demand that you, without delay, process and load our vehicle as contracted.

We do expect to hear from you by the end of business day today January 21, 2008 US EST, prior to refering this matter to external sources.

Jehad Jumaa Almustafa

Be a better friend, newshound, and know-it-all with Yahoo! Mobile. Try it now.

Never miss a thing. Make Yahoo your homepage.

More new features than ever. Check out the new AOL Mail!

Be a better friend, newshound, and know-it-all with Yahoo! Mobile. Try it now.